Members of the Court Council, my name is Sue Ellen Tatter. I'd like to reserve 10 minutes for the end. I represent Lamont Brown. I believe the record suggests that Mr. Brown did not get a fair jury. He didn't get a fair grand jury in the first place. The grand jury in this case exhibits integrity by misstatement. You could call them mistakes. You could call them lies. You could call them misrepresentations. But they are substantial. Tab A of my excerpt of record is a seven-page grand jury transcript. The first page is a cover sheet. The last page is the conclusion. There are five pages of substantive testimony in the grand jury. That's the whole case that was presented in support of an indictment against Lamont Brown. And much of the bulk of the testimony, the five pages left, is a mistake or misrepresentation or a lie. The first page is taken up with the prosecutor and the officer getting the informant mixed up with someone else. And so now we're dealing with pages two through six of tab A, which are substantive discussions of this case. And on pages three, four, five, and six, there are untruths about the degree to which this unreliable informant was wired. It's not about inconsistencies in testimony. It's not about some of the grand jury problems like contradictory statements. It's about this sole witness misrepresenting the degree to which the undercover informant was surveyed. In effect, Officer Mitchell was telling the grand jury in the quick little bit that the grand jury heard this, don't worry about him, he's an unreliable informant with a record for dishonesty, but we were watching him. That is the effect of what Officer Mitchell said. It was an intricate misrepresentation. He said, one, we had him wired. We wired him, his body. He had to be naked and he didn't say this, but that's how you wire an informant. You strap him up with a transmitter and wire. Two, he said he was transmitting. That is, they were listening to him. That's the effect. Transmitting is number two. Number three, he said he was monitored audibly. He was being heard, monitored by the officers. And four, he was recorded. And none of those four things were true. There was no body wire that was ever discovered. He wasn't being monitored on an audio channel. There was distant visual surveillance. He wasn't being recorded and he wasn't being surveyed by the officers and monitored audibly. Now, that's a major misstatement in the grand jury. And if a grand jury Fifth Amendment in this country means anything anymore, and I know it's been limited, but it still is there in the Constitution. What does the doctrine of mechanic do to this? He's been found guilty beyond a reasonable doubt on other evidence. Well, the first thing I'd say is we come in that small fraction of a window left open by mechanic. Mechanic involved a very minor grand jury irregularity of witnesses testifying in tandem. And I think the Bank of Nova Scotia case did too. They're talking about technical defects and they're leaving open the situation where this is substantial, almost as if there was no grand jury at all. The integrity is where the structural integrity of the grand jury is so deranged by the situation. And I'd say there's it's more similar to the Vasquez versus Hillary case where there was racial discrimination in. That's the one exception. But I don't think it's just has to be racial discrimination. Things that are the structural basis, the reason you have grand jurors. You don't have grand juries to make sure that people follow the right technical rules, like no two witnesses at the same time, the right number of grand jurors, the right kind of recording and oaths. The important thing is the grand jury gets to screen to say, is this worthy of going to trial? And that didn't happen here. It was wrong and incorrect on a major, the major basis. And I think Lamont Brown stayed in jail and stood trial. Could we could we look at it? I mean, we have to look at it both ways. Obviously, we look to see if there is a substantial influence on the indictment because of these false events. And the flip side of that is if you excise those, what evidence do you have left? And would that have been sufficient? So it would be helpful if you would take that because I know there was some telephone recording and observation of his body before he goes into the transaction. So maybe you could detail for us. I don't think it's a lot, but what's left in terms of the truthful evidence? Well, if you assume that there was no recording and that whatever the informant, Jose De La Torre, was doing was corrupt, and then you look at what's left in the indictment, they had visual surveillance of the people from the head up and they were suspicious meetings. And as the prosecutor said at closing argument, you don't have people go to movie theater parking lots ordinarily for 10 or 15 minutes. They usually go to a movie. And there were suspicious meetings, two suspicious meetings. There were telephone calls between the two setting up the meeting that were very hard to understand. And they were just suspicious. They didn't, of course, say, let's meet for Coke. They said various meeting things. So you had these two suspicious meetings and probably. I don't know whether this was in the grand jury testimony, but the most suspicious thing about it is that the informant is stripped search before the meeting. And he searched after the meeting and the differences that he has drugs after the meeting. I mean, that's that's suspicious indeed. That's well, that's what was that in the grand jury testimony. Well, it's in the context of research. The informant wired the informant drove to the locations, monitored the telephone conversations and recorded them. And then the prosecutor said, were they both monitored and recorded? Yes. Both telephone and body recorders were working. That's on page six of the grand jury. Now, the search. The grand jury didn't emphasize we stripped him. He was naked. We looked in his orifices. It just said search, wired and monitored in that context. So I can't say what the great I don't think the grand jury had a good description of of a thorough body search. And then one of the interesting things that happened at trial on the mechanic issue is that indeed, Jose de la Torre was Lamont Brown's mechanic and had total access to his cars. In fact, at the time of Lamont Brown's arrest, his car was sitting out as one of the exhibits that's in the record shows in Mr. de la Torre's front yard on blocks. So that the even if the grand jury heard about the strip search, which I don't think it heard in any detail other than searched, wired and recorded. The drug issue was undercut by the situation which wasn't presented to the grand jury, where de la Torre had constant access to Mr. Brown's car and to the glove compartment, to all kinds of places in the car. And that may sound far fetched, except when you think of how much of a short string this man was on to the INS, the kind of pressure he was under to deliver. He was facing major criminal prosecution and deportation for he was working with the task force. So this grand jury, in our opinion, wasn't a grand jury at all. It was major misstatements. It was brief. The misstatements were about intricate, complex stuff. The officer said it two times. He also went with the prosecutor to the magistrate to get in a restaurant and said the same thing. He was recorded. Now, then we moved to disclose the informant. And the magistrate granted the motion. I think that's Doctrine 28. One of the theories of the magistrate was there don't seem to be any contemporary tapes, so the defense should have access to who this person is. The prosecutor didn't correct that. The prosecutor confirmed that all discovery had been provided. And if there were these tapes, they would have been discoverable under Rule 16. So we get ready for trial. And the Friday before, we have the jank sack material, which suddenly has Officer Mitchell in his five-page grand jury presentation talking several times about how the police wired and recorded the informant. I think it goes more to the... I don't think the subtraction test is totally appropriate where the prosecutor or the officer is exaggerating the degree of control that the government has over this informant. At the grand jury, the government presented... Could you just run that by me again? I'm not... Well, usually... The subtraction test somehow gets altered here because of the informant. I just want to make sure I understand that. Well, there's two ways. If you saw a grand jury error, you could subtract under the harmless error test and say what's left. But I think there's more of an affection problem that goes to his substantial rights to be free from misrepresentation. I don't think there's any... I thought you were arguing subtraction and then you switched, so I just wanted to make sure I understood. Thank you. I would like to address other issues right now. I think there's an important sentencing issue here. I think the case the court cited, Velasco Heredia, is very important here and takes care of the government's cross-appeal and may even assist us with our argument that the acquitted conduct wasn't relevant and shouldn't have been aggregated. But I would like to reserve the eight minutes I have left, if that's all right. Well, the sentencing... Oh, I guess it doesn't matter. We can ask the government first. This is the court. On behalf of the United States, my name is Stephan Collins. As the prosecutor of this case, I do regret the mistake that occurred. It cast a pall upon the government's case in that we understand the embarrassment before the trial court as well as the trial jury. To benefit the defendant, however, as a result of that discovery, Ms. Tatter used everything she had against the government's case and used the mistake before the grand jury to assail the credibility of Officer Mitchell, who was an undercover officer in this case, and he admitted to the jury that he had made the mistake. The trial court as well as the trial jury, however, ultimately decided that it was immaterial to the question put before it. Was the defendant, Lamont Andrew Brown, guilty of distributing drugs on those two occasions? And the jury found beyond a reasonable doubt that he had in fact distributed with the knowledge, full knowledge, that Mr. Dellatore was not wearing a body transmitter. Up until the date that Ms. Tatter filed the motion, I as a prosecutor was under the impression that this was not a case of a failure to record, but that it was a failed recording in that, as often unfortunately happens, wires do get, I do mean the electrical wires, get disconnected and the conversations are not recorded. Or there are times where there's absolutely incomprehensible portions on the tape so that they do not further the government's case. When it was discovered that there was a failure to record, we proceeded to hold the hearing before Judge Sessions. Wait a second, you mean at the time of the grand jury testimony, you just thought that the recordings were no good and unintelligible or something? At the time we did the presentation to the grand jury, I did not know, I did not listen to the body, what was believed to be the body wire tapes. Afterwards, in preparation for the case, I thought it was a failure to record and that it did not strike me as being critical to the ultimate issue of when should we proceed with the case. Because, as the grand jury testimony showed, that the informant was searched before and after, and that after each transaction he provided drugs that were not there before, that there were officers observing the contacts between Mr. Brown and Ms. Tatter, contacts that Mr. Brown arranged on telephone calls that were recorded, that were incriminating, contrary to Ms. Tatter's representation, and that showed that Mr. Brown was there for the purpose of distributing drugs on those two occasions. So there was enough probable cause in the grand jury transcript to proceed with the indictment. However, Ms. Tatter did observe when it ultimately was discovered that it was a failure to record, that there was an issue that had to be addressed. When that was discovered, we had two options, the government did. We could either dismiss and have gone back to the grand jury and sought the indictment, and then proceed then to try Mr. Brown, or to proceed with the hearing that Ms. Tatter asked before Judge Grisham. Judge Selig heard the testimony of Officer Mitchell. He observed his demeanor, and he determined that although Officer Mitchell had made a mistake, had misled the grand jury, it was neither intentional nor material to the finding of probable cause. So then, to the advantage of Mr. Brown, technically, by proceeding to the jury, jeopardy attached, and with what she knew, Ms. Tatter knew, she had an ability and avenue that she was not aware of, I would submit, prior to that, to attack the government's case. And if she had succeeded, then Mr. Brown would not be standing here today asking that you reverse the conviction. He would not be standing here at all. He would have been acquitted of the conduct. In reviewing the entire record in this case, the testimony of Mr. Dellatorre came out at the trial, and Ms. Tatter again assailed him every which way she could. And I disagree with her assessment that he was uncredible, because the trial jury ultimately determined that he was reliable. They disregarded the theory that he planted the drugs. Well, how did they, why did they acquit on the drugs that were found in the car? I don't, I don't, I mean, I, I wouldn't, maybe they thought they were planted by Dellatorre. Or perhaps they thought that it was merely Mr. Brown's own personal use, as opposed to possession of the intent to distribute, because he did make statements about being involved in the drug business. I don't know. It's speculation on my part. Is your argument that somehow, because he got acquitted, that that fixes the grand jury problem? Well, that count was not presented at the time that Officer Mitchell testified. The two counts that they did convict him on were the substance of Officer Mitchell's testimony. Right. So the acquittal, I think, is irrelevant to the grand jury question. The grand, the trial jury, fully aware of all the facts, was able to make the credibility determinations that they did. Or that, and I'm just having some trouble with your logic, so then it's the fact that he got convicted, that doesn't somehow say if there's a grand jury problem, that doesn't say that. He was convicted on the two counts that Ms. Hatter attacks as being tainted by the misstatement. That's right. The third count, which they acquitted him, was not the basis of that presentation. So I think that's a separate issue, that the grand jury consideration of count three is untainted at all by the misstatement. So the acquittal on that count, mysterious as it is, even Judge Sedwick noted that he would have found the defendant guilty on that count, is not, I submit, relevant to the analysis of the grand jury issue she raises as counts one and two, those of which she was convicted. Ms. Hatter, in her trial of the case, defense of the case, argued that Judge Sedwick erred when he abused his discretion by not allowing her to present expert testimony. Judge Sedwick found that the proposal of the two experts, of which she never provided qualifications nor proposed statement, would have been a rather tiny issue during the case. Judge Sedwick did not abuse his discretion. The other issue with regard to those quote-unquote experts is that Judge Sedwick erred when he quashed the subpoena. Again, the defense failed to establish any relevancy to any of those documents that she suspected or believed might be in Mr. Dellatore's file. The government, prior to the trial, provided the defense with all documents that it believed were relevant to Mr. Dellatore's decision to cooperate. And during the trial, we had a discussion, by that I mean Judge Sedwick, Ms. Hatter, and I, on behalf of the government, had a discussion about what other documents might be in the aid file and relevant. Again, this never established a relevancy. The court directed me to go back and look at the other portions, and there were some documents that I thought were potentially relevant, and I turned those over, and the defense conceived that. But they never did establish what other documents. And even if she were to suggest that it was there for Judge Sedwick himself not to look at it, again, for what would he be looking? There was no relevancy standard. There was nothing to establish why this document was there. Well, I mean, you can figure that out. I mean, you get the defense attorney to write out a list of things that the judge should look for. That's true, but that didn't happen in this case. The defense didn't do that. The defense never said, Your Honor, this is what I think is relevant. And even in the arguments, I have experts who would say that I could find some relevance. But again, when offered that opportunity, the defense never stated, here's what we think, and that's why the court should look at it. Based on the record in this case and the tactics chosen by the defense, Judge Sedwick was left with, one, an initial irrelevant inquiry, and, two, nothing to guide him into looking at other documents. Well, how come you didn't pick up at the beginning that there was no recording and no wiring of the list? I learned that there was no wiring and no recording later on. I thought what we had was a failure of the recording. But I mean, how come you didn't know this before you went before the grand jury? Because at that time, when I prepared the case, Mr. Officer Mitchell, I presented the telephone tapes and the videotapes, and I didn't listen to the portion of what he represented to be the body work, because the telephone conversation and the videotapes clearly established the probable cause that Mr. Brown had committed these offenses. So it was later on that I discovered... You didn't ask him, where is the body tape? I did not at that time, Your Honor. That was there on my part. In hindsight, now I look back that when there's a failure of a recording, I should ask, was, in fact, there a failure to record? I concede that I did not ask him at that time. It was something that his instructions... If you thought at the time you were going to the grand jury that there was a failure of recording, you still can't go in and try to convince the grand jury to issue an indictment because the guy was wired. I concede that that's how it looks, that there was monitoring of the surveillance officers, there was monitoring of the video officer, there was the monitoring of the telephone calls, and so in that regard, I thought that there was sufficient monitoring of this transaction to occur. The issue that remains, I think, is the issue of the sentencing. I disagree with my colleague. You almost know that whatever you tell them, you're going to get an indictment, right? Excuse me? You almost know that whatever the grand jury is told, they're going to return an indictment. Well, I think there has to be a good faith basis to believe that there's sufficient evidence to proceed with the case. Have you ever had a grand jury in this district return a no bill? Yes. When was that? I think it may have been the last session or the session before that. Really? What happened? I don't think they like the theory of the offense. That's my take on it. That's the second no bill. No, that's the third no bill I've heard of in the Ninth Circuit in the past, whatever, 35 years. Granted, they don't happen often, but I do recall there was one perhaps about 10 years prior to that, of which I'm personally familiar. Why don't you tell us why Velasco Herrera doesn't control here, now that we have a new Ninth Circuit case, on the sentencing issue and the exposure Mr. Brown faced in terms of his overall exposure? Actually, Velasco Herrera does provide some guidance in this case, and I think it does support our case. And here's why. At the fact-finding phase of Mr. Velasco Herrera's case, the court found beyond reasonable doubt that he was involved with a drug trafficking offense. However, the court did not make a specific finding beyond reasonable doubt as to the quantity. By those specific facts, beyond reasonable doubt, the court established the statutory penalty scheme under which Mr. Velasco Herrera would be sentenced. Granted, at that time, no one was aware of the consequences of the Apprendi, and Judge Gonzales, I believe, believed that she still had the authority to determine the statutory scheme under which Mr. Velasco Herrera would be sentenced. Apprendi and Buckland and the other cases have established that that is incorrect, that the conviction, the facts used to establish the conviction not only establish the defendant's guilt, but under the drug trafficking laws, the statutory scheme. In Mr. Velasco Herrera's case, the maximum was five years. The sentencing guideline calculation in that case, Judge Gonzales ultimately determined that his guideline sentence would be below the maximum statutory gap. However, believing that her finding would trigger statutory sentence imposed the statutory mandatory minimum under 841b1b, while incorrectly 841b1d applied. In Mr. Brown's case, the jury found him guilty of two offenses that carried maximum penalties of 40 years with mandatory minimum sentences of five years. Under the guidelines, if there was enough cocaine based on Mr. Brown's table, the court could have sentenced him to 80 years. But we didn't even approach that. The, what the government proposed to the court is to consider the additional quantity that he admitted in the statement at the time of his arrest. We did not submit that the court should apply a different statutory scheme, but rather apply the guidelines as they apply to drug trafficking offenses. And even the guidelines themselves hold that where the guideline calculation exceeds the statutory cap, the statutory cap prevails. We never argue that the court should find Mr. Brown subject to the penalties under 841b1a, which is I think what Judge Sedgwick was concerned about, because the 50 grams of crack is what triggers the application of b1a. We argue that he should sentence him under b1b, which fit within the trial jury's verdict, because there were more than five grams of crack involved in both offenses. Is your interpretation of law school here that it applies only when the judge's additional finding projects somebody into a statutory scheme that requires a sentence higher than what would have been the guideline range under the jury's finding? No, I think that there would still have been error in Valeska Heredia if the trial court had held that the sentence scheme under which Mr. Valeska Heredia was exposed was five years to 40, but still imposed a sentence below that. It would have been a harmless error in that context. But what happened in that case was the converse. She found that the guideline sentence was below the statutory, but then applied the statutory, and I think that's where the error was. In this case, we're arguing... It was a new statutory. Excuse me? It was a new statutory. Correct. She would believe that it was... But she was the one that the jury's finding would have led to. Correct. In this case, we asked that the court apply the guidelines within the statutory scheme of 841b. And granted, at the time that our case progressed, I think Judge said, most everybody was still trying to figure out the implications of Apprendi. So you're saying that by doing that, because you had already set the maximum, there was no possible excess exposure in effect? Correct. And we were asking him to change the statutory consequence of the jury's decision. And so what we asked in this case... I mean, suppose that you had said, we want you to consider the additional 34 grams, I think it was. Yes. And in fact, that exposes him to a life sentence maximum. And the judge accepted your argument and then sentenced him to seven years. If we had taken the position that the court could change the statutory scheme, I think we would be wrong. But Velasco Heredia would say... It would be wrong, but it might... I mean, we've got cases like Garcia de Mizar, which say it's harmless if you weren't sentenced beyond the maximum to which the jury's findings would subject you. Well, sure, it would have been error, but it would have been harmless if the court imposed a sentence like that. It would be so, but I am a little puzzled by Velasco Heredia because it seems to modify that regime a little bit, but I agree that it's... I see your distinction between Velasco Heredia and your situation. And I think that's where the court... At this point, we're not asking that the court remand so that the court can or should put the 34 grams in because the trial court just said it. It did not even address whether or not he would include those. So we ask that the court remand the case back so he can make a decision of whether or not, by either preponderance or if the court feels compelled to apply the claim convincing that Mr. Brown is subject to the additional. Because that's not on the record before. We don't know how Jeff said it would rule ultimately because he decided to avoid that issue altogether. If there are no other questions, then... But you have a much higher guideline range, of course. You would have a higher guideline range, but it would not even approach the life. I think that taking the most conservative approach is that we suggest that the potential increase would be 4 to 5 years. And that would expose him to, I believe, anywhere from 12 to 15 years. Which, even if the jury convicted him under H41B1C, the maximum is 20. It still would have been less than the statutory gap in that case. All right. Thank you. Ruth Edelman. I have about seven minutes left. I'd like to first address the A file issue. In this case, we discovered during trial that the INS had engaged in very peculiar, what I would describe as shenanigans, with this informant. And we didn't know this before trial. This is like a freight train that's going on to conviction. And very quickly we learned, during trial or shortly before, that the INS and marshals had taken this man on a trip to Tok, at the border, over by the Yukon, and had him run around the customs house, back in so he could be paroled once again to INS to do further work. And apparently he'd done something bad again, and this required him to be re-paroled to the INS so he could be on a shorter string. In that circumstance, where we're playing catch-up ball, we didn't even know that he was an illegal alien on the Friday before trial, despite discovery requests. We shouldn't have to guess or articulate what's in the A file before the court does an in-camera review. In the situation where Officer Mitchell, who made misrepresentations, is monitoring the informant, the prosecutor is supposed to be monitoring Officer Mitchell, but persists in believing that there's tapes or no tapes, the judge should have been checking the checkers. The judge should have had the A file in-camera to make a determination of what was discoverable. Did you ask for that? Yes, we did.  The prosecutor made his own review, but the judge didn't go beyond that. We wanted the A file or the A file in-camera. Now no one can decide, was this fair? Was this fair confrontation? What was presented to the jury on the immigration status of the pervert? He was presented as an illegal alien who had several minor crimes that might have triggered deportation, that he'd been working for money for the I.M.S., that he was using drugs while he worked for the I.M.S. What I was worried about in the A file... Was he asked about, or was it Mitchell or Mr. Dillatory asked about the fact that he'd gone down to the border for this little shuffle? At the very end, because we learned some of that at mid-trial, and I recalled him to ask him that. But that's what they let me see. I don't know what else is in there. And if he were, for example, subject to arrest for sexual abuse of a minor that hadn't surfaced in the state court yet, that would keep him on an even shorter leash that he would be more inclined to produce, more pressured to produce for I.M.S. I don't know what's in there, and I can't speculate, but I think we were entitled. Given the fertility of what the little nibbles we found, the judge should have impounded that in camera at the least, if not disclosed it to us. That was our whole case, and it was a confrontation problem that we didn't get it. Now, even apart from that, with respect to the sentence, Mr. Collins seems to suggest that he intended that the sentence go up with the extra cocaine from this statement based on the guidelines. And just because they call it the guidelines doesn't mean that the judge isn't bound to read the statute and see that he is exposed to a greater statutory cap. His exposure goes up, and Velasco Heredia suggests it's the exposure that's the problem, not just the actual sentence. Buckland, Norby, and Velasco Heredia suggest that for drugs raising the statutory cap, impacting the sentence, it has to be material that's charged and proven to a jury beyond a reasonable doubt, and not just that the judge says in an offhand manner, oh, I don't know why the jury did that. I think it was beyond a reasonable doubt. The language, I believe, in Norby is proven to a jury. The jury in this case said that the amount attributable to Lamont Brown from the car incident was zero. That is, he wasn't guilty of count three, and therefore I think this new case not only helps us with the cross appeal, but I think casts doubt on the use of the acquitted conduct here. The judge just decided that he thought it was beyond a reasonable doubt, but there's a contrary ruling, and some of those cases say proven to the jury, and it's one thing if you stipulate or if you plead guilty, but we want to trial, and the jury said zero grams for number three. So I think that there should be a remand on that issue, and I notice I'm almost out of time, so I'd appreciate any questions that you have. Anything else you want to say? Well, I feel Lamont Brown... We'll keep you on a leash. Okay, short leash. I think this was a very quick case. Sometimes people talk about railroading justice, but I felt this case was on a freight train to Lompoc. This was a five-page single witness grand jury. A lot of what was told to the grand jury was untrue. The informant had a lurid history, only part of which was disclosed to us mid-trial, and we couldn't get his whole history from the INS because we couldn't get his A file. I think it's not very often, but in certain cases there was injustice, and this grand jury and the failure to provide the A file were an injustice, and I'd ask for a remand for a new indictment, and failing that, a remand for whatever you think appropriate. Very well. Thank you. The matter stands submitted.
judges: Pregerson, Canby, McKeown